Our second case for this morning is the Securities and Exchange Commission against Siming Yang. And we will hear first from Mr. Moreland. Good morning, Your Honor, Your Honors. May it please the Court, my name is James Moreland. I represent the defendant, Appellant Siming Yang, in this appeal. There's one date in this appeal that's critical, March 14, 2012. On that date, 50,000 shares of Zongping Inc. common stock were purchased. In addition, 1,900-plus options, April and June co-option contracts, were purchased. For the purposes of this appeal, those options are irrelevant. The record is clear that those options were never exercised, and they expired worthless. The main issue on this appeal is subject matter jurisdiction. Mr. Yang is a citizen of the People's Republic of China. Let me interrupt and say that you're not, if you're talking about Morrison, speaking about subject matter jurisdiction. What you are speaking about, as the Supreme Court has made quite clear, is whether a claim is stated when there are certain contacts in another country, here China, and certain contacts in the United States. And I would suggest to you that this case is actually quite different from Morrison, which was sometimes called an F-cubed case, foreign everything, basically, because this was a Delaware corporation and the shares were traded on the NASDAQ and the Chicago Board of Options Exchange, both contacts that I would say seemed to me easily to support the jurisdiction of the commission. Jurisdiction in the sense of legislative authority to regulate. Correct, Your Honor, and following Morrison, the Dodd-Frank amendments affected the Investment Advisors Act, Section 214a and b, and Section 27b of the Securities Exchange Act of 1934, which are the two provisions upon which the SEC. Right, in a way that doesn't help you, I think. Looking at those amendments, this seems really quite clear. Jurisdiction over any conduct within the United States that constitutes significant steps and furtherance of the violation, even if the violation is committed by a foreign advisor and involves only foreign investors. Significant steps, Your Honor, is the application in Subsection a, and in Subsection b, the application. So you say the SEC can't consider front-running a significant step? No, Your Honor. With respect to the insider trading, the case was propped up before the district court. When the jury returned a verdict in favor of Mr. Yang on the insider trading, then we moved to the question of whether the front-running, which was charged as an anti-fraud violation under the Advisors Act and under the 34 Act, pertains to extraterritorial jurisdiction. And then also with respect to the Schedule 13D deficiency or alleged deficient filing, whether that's appropriate. It's quite unlike more, I mean, I guess the best thing I can say for you is you were arguing for a very expansive understanding of the reach of authority that Morrison was discussing. This case is really quite unlike Morrison. And also I think a very restrictive reading, you are arguing for, of the amended statute. Your Honor, I think I'm arguing that Morrison, I agree with you. Why did the SEC not have authority over transactions that take place in the United States, which was not the case in Morrison, by the way. Those were Australian transactions. That's correct. What the SEC does not have jurisdiction over is that the conduct that occurred that affects the United States all occurred in China. So we look to Subsection B. Were the trades not in the United States? The trades were entered in China. They were executed in the United States. Right. There are 50,000 shares. They were executed in the United States. Yes. They wouldn't have happened had it not been for the U.S. angle. But they must be substantial. And, Your Honor, the record is clear. Those 50,000 shares that were purchased on March 14th is really the only number of shares that we're talking about. In fact, on that day, there were over 3 million shares traded of Zonkin stock on March 14th. The 50,000 shares are .01% of the volume that day. So where in the law does it say the Securities Exchange Commission has no authority to pursue violations when the percentage of shares falls below X? With the words significant and substantial. But you're assuming that that means percentage of shares. 50,000 shares is not a substantial number? Not in relation to the 3 million shares that were traded that day. In relation to. But where does that define the Commission's authority? It's nowhere in the statute, right? Well, the statute doesn't define percentages. It talks about substantial and significant. And my point is that 50,000 shares in relationship to 3 million shares is .01%. In relationship to the number of shares that Prestige Trading Investments purchased, it changes the equation by a tenth of a point. The Commission is concerned with more than whether Prestige and Mr. Yang are happy with what's going on. The Commission is concerned with the integrity of U.S. markets. Correct. So I'm still not sure where it says it needs to be this relative assessment. One other point is that these 50,000 shares are a thousandth of 1% of the number of Zongpin shares that are outstanding, 37.5 million. That 50,000 shares is totally insignificant. With respect to the front running, they're charging this as a 10B5 violation. If we look to Ernst & Ernst v. Hockfelder, there's a very precise language there. There's deceptive devices and contrivances. There's manipulation. There's all those things. And for a hundredth of a percent of the volume of that day to constitute a manipulation is really, really far-fetched. With respect to the Schedule 13D statement, Prestige disclosed Mr. Yang along with the other investors. It disclosed his nationality. It disclosed his source of funds for the purchase of these securities. It disclosed the purpose for which those securities were purchased. That was to participate with management of Zongpin in improving that company. The only thing that was not disclosed was those 50,000 shares in the First Amendment, in the first filing. And the jury finds this is a material omission. The jury found it was a material omission, and I believe that reasonable minds can differ on that. But that's not the standard for jury verdicts. We don't set aside a jury verdict any time we think reasonable minds could differ on the outcome. That's understood, Your Honor, but I believe that you – the threshold question is whether there remained any subject matter jurisdiction at that point after the – It's not subject matter jurisdiction. You mean claims stated. The question is whether there was substantial activity outside the United States that affected U.S. markets. I'm contending to this Court that there was not substantial activity. Are you – you're making that same argument for the Schedule 13D violation? Yes, the Schedule 13D violation. Everything is disclosed. Do people get to lie on Schedule 13Ds whenever they unilaterally decide there's not enough effect in the U.S.? I don't believe there was a lie here, Your Honor. At best, it was an inadvertent omission. Well, wasn't that the question for the jury? Surely that's a factual question for the jury to decide, whether it was a deliberate material omission or whether it was just a careless mistake. The difference between – on the Schedule 13D, the difference between the 8.5 percent of Zonkin stock that Prestige purchased over that period, March 15th to March 22nd, is one number. Had that 50,000 shares been added back in, it would have been 8.6 percent. No reasonable investor would have had any change in what they were doing based upon that one-tenth of a percent difference. I'm saying it's de minimis. Why is it just – I mean, I understand your argument. I mean, it's a very numerically driven argument, and you may not be wrong that these were small amounts, but I don't see why the jury was bound to assess what Mr. Yang did in this light. I mean, he didn't put down his trading. And that's why – I mean, the district judge says, hey, you know, I know this isn't the worst violation I've ever seen, but this is – you know, we're down to the front-running part of the case, and when you don't put your own purchases down, you deprive the SEC of the information to see what's happening. Well, again, and going back to the whole concept behind front-running is that the person who front-runs gets an advantage because they know behind them is this big order for shares of stock that they will profit from. Well, in fact, Mr. Yang on March 14th paid 15 cents more per share than Prestige did the following day. So Mr. Yang obtained no advantage whatsoever from the 50,000 shares that were purchased on that one day in front of Prestige. So sometimes your bet doesn't work out. I mean, does that mean front-running is not a violation anytime you don't earn money from it? No, but it's certainly a mitigating factor. Was this issue litigated in the district court, the materiality of the front-running? I believe it was, Your Honor. I don't – the record is not clear that we got down to the percentages as fine as I've done in the brief here, but I believe that the overall materiality of the 50,000 shares versus everything else that occurred in this case was part of that record somewhere. I can't point you to a particular page. Once more, I remind you, you're in your rebuttal time.  Except for the fact that if, in fact, these are de minimis, and I go back to the question of substantial that would trigger the Investment Advisors Act and would also trigger the Exchange Act violations, if those are not triggered or if those substantial is triggered, then the jury had no jurisdiction to enter the verdicts that it did, and therefore the district court had no ability to enter the permanent injunction and $150,000 in civil penalties. Okay. Thank you. Thank you. You can save the rest of your time for rebuttal. Mr. Frayden. May it please the Court. I'd like to start with the only issue that's been preserved for this appeal, and that is the Section 214 issue from the Advisors Act. As Your Honor was pointing out, the materiality issues both for the front-running was, I don't even think was raised in the briefing, and certainly for the 13D was never raised in the JML or at any time before the district court. So those issues are not preserved for this appeal. I'd be happy to talk about the merits of them as we do in our brief, but I don't think that the appellant has raised any notion that there was plain error in any regard regarding these issues. Regarding the Section 214 issue, I shudder to disagree, but I'm not sure that this is a Morrison issue. I agree that it's not a Morrison issue, but I'm not sure that it's not jurisdictional, and I don't think the court really needs to make a decision between the two because I think if it's not a jurisdictional issue, then it's a merits issue regarding the claim, and again, it wasn't raised, so it's not before the court. If it is a jurisdictional issue, then the court can raise it on its own accord. Well, that's right. The reason I say that is despite the language of the amended statute, the Supreme Court has a string of cases that's probably about 10 long at this point in which it has urged everybody, lower courts, counsel, anybody involved in the system, to be careful about what we call subject matter jurisdiction, what we call very important claims processing rules, what we call things that, as Justice Scalia would have put it in his Hartford dissent, questions of the legislative scope of the U.S. laws for which you can quite properly use the word jurisdiction. It's just a different kind of jurisdiction. So I'm very wary in light of this very long line of decisions from the Supreme Court to go out on a limb and say something is the kind of subject matter jurisdiction, as you say, that you can raise even at the Supreme Court level certainly here at any time. Right, and I agree, Your Honor. I think what the court said in Arbaugh, though, and we didn't cite it in our brief because we didn't get into this, frankly, because it wasn't raised. Arbaugh suggests that if Congress says it's jurisdictional, then the court is willing to treat it as jurisdictional. And if you read Section 214, it's embedded in the jurisdictional aspect. I think the heading says jurisdiction. It's clearly intended to reverse Morrison regarding the scope of the Exchange Act and the rest of the Securities Acts. And it references Section 204 specifically. So in that way, I think Arbaugh would suggest that when Congress claims it's jurisdictional, it is jurisdictional. Again, I don't think it matters here. But I wanted to clarify that I think there is a wrinkle here about whether and it seems that Congress intended, if you read the legislative history, intended this to be jurisdictional. Whether it has an effect on a specific case, I couldn't speculate. But I just did want to clarify that I think there is a suggestion from Arbaugh that if Congress says it's jurisdictional, it is jurisdictional. But to run through, I think Your Honor had it exactly correct. This case is quite unlike Morrison because the transactions were located here. This was the U.S. markets. This was a U.S. registered security. The trading was on NASDAQ. The brokerages were located here. So would one share traded on NASDAQ be enough? Would that be conduct within the United States sufficient to trigger the commission's jurisdiction? I'm reluctant to go into hypotheticals other than to say if that's the extent of the fraud. But it's an important hypothetical because Mr. Morland's whole argument is that there's a quantitative yardstick there. And if there is, then maybe he's within a free zone. If there is not, then the commission has to say even one share is enough. Well, I think fraud has no quantitative measure. If he was willing to front run his client's trades for 50,000 shares of Jonathan's stock, which was not an inconsequential amount of money, was in the hundreds of thousands of dollars, then certainly that's substantial steps. I mean the statute asks for substantial steps within the U.S. The entirety of the transactional fraud was committed on U.S. markets, U.S. soil if you would. So in that regard, the quantitative measure doesn't really come into the calculation. So you're just saying the fraud itself was just this confined thing in the U.S. and you can't say a little bit of fraud is okay. Right, nor would I say that using U.S. markets to commit fraud against your Chinese clients is okay. I think we have a real interest recognized in the extraterritoriality provision in 214 that we want to ensure that our markets are the integrity of our markets is protected, regardless of whether you're trading for a foreign investor or a domestic investor. I mean think about the signal we'd send to the rest of the world if we were to say that the Advisors Act only applies to domestic clients or to domestic advisors. If the trading's here, there's substantial steps here. The fraud was committed on U.S. markets. Mr. Frieda, is it your view that the waiver point is applicable to the injunctive relief as well? We did make that argument in the brief. He never raised these specific arguments regarding the injunctive points. We did go into the merits of them. I'd be happy to talk about them. The court found it very significant that Mr. Yang engaged in trading on U.S. markets while his accounts were frozen and did not disclose this even though they were subject to a discovery request and then made the point in his briefing that an injunction shouldn't apply, that he was not going to trade on U.S. markets anymore. He also engaged in a transaction that the court deemed to have been an attempt to circumvent the court's own asset freeze. These actions, I think, clearly raise issues about whether or not he is inclined to, reasonably likely to commit future violations, and that's the standard for the injunction. If the court were to reach it, it would be an abusive discretion standard anyway, and I think the court was well at his discretion in making that determination. If the court has no further questions, we would rest on our brief. All right. Thank you. Thank you very much.  Yes, please, Your Honor. First off, with respect to the front-running constituting a 10b-5 fraud, this is a case of first impression in this district, in this circuit, regarding that issue. It has been rarely raised in other forms. The only other place that I'm aware of is in the Honor case, H-O-N-O-U-R, where it was raised in the SEC's administrative forum, and they found front-running to be a 10b-5 fraud. Otherwise, front-running is treated by the security industry self-regulatory organizations, the exchanges, as a violation of just and equitable principles of trade. But why is it contradictory for the commission to look at something that FINRA and others think is bad behavior and think about it and say, well, we actually think this rises to the level of a 10b violation? That's what they're doing here. Yeah. I mean, I don't see what's wrong with it, actually. I'm not saying anything's wrong with it. I'm saying this is what they're doing here for the first time in this particular circuit, because since the 80s, that has always been simply a market regulatory issue. And to raise it to the level of fraud speaks to the question of Hockfelder's language. To constitute front-running to talk about that being a deceptive manipulative device or contrivance, it has to fall within that. And to say 0.01% of the volume on March 14th would be manipulative doesn't cut it. That's, I think, the main point there with respect to the injunctive action that was alluded to. Yes, Judge Cannelli issued an injunction. My first point on the injunction is that it should be considered before we get to the issues of the verdict. Subject matter of jurisdiction going forward, that wasn't there. Injunctions should not have been issued. But even if you look at the substantive injunction that was issued, it wasn't issued with respect to anything Mr. Yang had done in terms of front-running or the Schedule 13D. It was issued because, after trial, there was this transfer or this cancellation of a payment to Mr. Yang that was deemed to be an effort to turn around or get around the civil law. The judge characterized it as an effort to avoid his obligations. Right. The asset freeze. And then there was the discovery issue after the fact. Mr. Yang had opened another account at Fidelity and purchased another Chinese company that he perceived was going to go private, like Zhang Pin was. And, in fact, he was right. That happened there. This guy's a securities analyst. So why can't he do it in China? I mean, you know, the SEC is basically saying, we don't want you doing this in the United States. But those two things, the cancellation of the payment and the discovery, Judge Kelly's injunction says, you shall not violate Section 10B and Rule 10B-5 or Section 13D or Rule 13D-1, which have nothing to do with the conduct that Judge Kelly determined warranted the injunction. He issued an injunction on two statutory sections that were not violated in terms of the payment, cancellation of the payment, and in terms of the discovery problem. For those reasons, I ask the Court to vacate the injunction and vacate the civil penalties. Thank you, Your Honor. All right. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.